UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

LEILA T. THOMPSON,

        Plaintiff,

    v.                                       CAUSE NO. 2:20-CV-114 DRL

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

OPINION & ORDER

Leila T. Thompson appeals the Social Security Administration's decision denying her application for disability and disability insurance benefits under Title XII of the Social Security Act, 42 U.S.C. § 423(a), and for supplemental security income under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3). Ms. Thompson requests reversal of the administrative law judge's decision or remand for further consideration. The court remands for further proceedings.

BACKGROUND

Ms. Thompson applied for disability insurance benefits and supplemental security income in August 2014, alleging disability beginning February 25, 2014 (R. 42, 253-70, 1138). An ALJ denied the claims on March 7, 2017 (R. 20-30). After the Appeals Council denied review, Ms. Thompson appealed to this court, which remanded the case on February 14, 2019 (R. 1187-1203). Following a supplemental hearing, an ALJ again denied benefits on December 12, 2019 (R. 1109-21). Ms. Thompson seeks review of the ALJ's decision. She filed her complaint here under 42 U.S.C. § 405(g).

STANDARD

The court may review the ALJ's decision under 42 U.S.C. § 405(g), but review is bound by a strict standard. The court evaluates the ALJ's decision as the Commissioner's final word. *See Schomas*

*v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). The ALJ's findings, if supported by substantial evidence, are conclusive and nonreviewable. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is such evidence that "a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), and may well be less than a preponderance of the evidence, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). If the ALJ relied on reasonable evidence and built an "accurate and logical bridge between the evidence and her conclusion," the decision must stand. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Even if "reasonable minds could differ" concerning the ALJ's decision, the court must affirm if the decision has adequate support. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

## DISCUSSION

When considering a claimant's eligibility for disability benefits, an ALJ must apply the standard five-step analysis: (1) is the claimant currently employed; (2) is the claimant's impairment or combination of impairments severe; (3) do her impairments meet or exceed any of the specific impairments listed that the Secretary acknowledges to be so severe as to be conclusively disabling; (4) if the impairment has not been listed by the Secretary as conclusively disabling, given the claimant's residual functional capacity, is the claimant unable to perform her former occupation; (5) is the claimant unable to perform any other work in the national economy given her age, education and work experience. 20 C.F.R. § 404.1520; *Elder v. Astrue*, 529 F.3d 408, 412 (7th Cir. 2008). The claimant bears the burden until step five, when it shifts to the Commissioner to prove that the claimant can perform other work in the economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Ms. Thompson satisfied step one because she hadn't engaged in substantial gainful activity since April 1, 2012, the alleged onset date (R. 1111-12). She satisfied step two because she has severe impairments of multiple sclerosis and degenerative disc disease of the lumbar spine (R. 1112). At this step, the ALJ also considered Ms. Thompson's other impairments, including an ovarian cyst and

obesity (R. 1112). At step three, the ALJ found that Ms. Thompson didn't have a conclusively disabling impairment or combination of impairments (R. 1113), so she formulated a residual functional capacity (RFC) that permitted Ms. Thompson to do sedentary work with additional limitations (R. 1113-14). The ALJ limited Ms. Thompson to occasionally operating foot controls bilaterally; frequently operating hand controls bilaterally; occasionally reaching overhead bilaterally; frequently reaching in all other directions bilaterally; handling items frequently bilaterally; fingering and feeling frequently bilaterally; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; never working at unprotected heights; occasionally working with moving mechanical parts, operating a motor vehicle, or being exposed to vibration; performing simple, routine tasks and simple work-related decisions; occasionally interacting with supervisors and coworkers; and never interacting with the public (R. 1113-14). Ms. Thompson satisfied step four because she was unable to perform past relevant work (R. 1119). Based on the vocational expert's testimony and considering Ms. Thompson's age, education, work experience, and RFC, the ALJ found that there were jobs that exist in significant numbers in the national economy that Ms. Thompson can perform, including address clerk (DOT 209.587-010), document clerk (DOT 249.587-018), and account clerk (DOT 205.367-014) (R. 1120). The ALJ thus decided that Ms. Thompson wasn't under a disability as defined in the Social Security Act and denied her request for benefits (R. 1121).

Ms. Thompson argues four reasons for remand: (1) the ALJ didn't properly assess her fatigue; (2) the ALJ didn't properly weigh the opinion evidence; (3) the ALJ didn't properly assess her symptoms; and (4) the ALJ didn't properly consider the evidence from Ms. Thompson's mother.

A.    *Assessment of Ms. Thompson's Fatigue.*

Ms. Thompson argues that the ALJ didn't properly assess her fatigue in crafting the RFC. The RFC is the maximum a claimant can still do despite her limitations. *Craft v. Astrue*, 539 F.3d 668, 675-

76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1)). It is based on medical evidence and testimony by the claimant or others. *Id.* at 676 (citing 20 C.F.R. § 404.1545(a)(3)). The ALJ must determine "which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding." *Id.* (citing 20 C.F.R. §§ 404.1527(d), (f)). The ALJ must consider "all medically determinable impairments, physical and mental, even those that are not considered severe." *Id.* (citing 20 C.F.R. §§ 404.1545(a)(2), (b), (c)). An ALJ cannot simply disregard evidence; instead, the "ALJ must explain why [s]he does not credit evidence that would support strongly a claim of disability, or why [s]he concludes that such evidence is outweighed by other evidence." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010).

An ALJ's decision is erroneous if she doesn't build a logical bridge from the evidence to her conclusion. *Id.* at 618. Though she needn't "specifically address every piece of evidence," *id.*, she cannot "simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding," *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Here, the ALJ considered evidence of Ms. Thompson's fatigue, but the ALJ didn't build a logical bridge from the evidence to her conclusion. In previously remanding this case, the court (though another presiding judge) noted, "[b]ecause the ALJ offers no explanation of how the RFC accommodates Plaintiff's fatigue, the RFC is not supported by substantial evidence" (R. 1191). This ALJ committed the same error. The record contained ample evidence that Ms. Thompson suffered fatigue. For example, Dr. Daksha Vyas opined that Ms. Thompson would need unscheduled breaks every 30 minutes to an hour for about 15 minutes (R. 809); Ms. Thompson's physical therapy notes documented that she needed frequent rest breaks (R. 2529-32); and Ms. Thompson's doctors noted that she suffered from fatigue in conjunction with her multiple sclerosis and prescribed her medication to combat the fatigue (R. 626, 759, 814-15, 838-39, 845-46, 850, 854, 858, 863, 865, 869, 872, 875, 880, 884, 888, 892, 894, 898, 800, 904, 906, 910, 1001, 1382, 1398, 1700, 1705, 1707, 1717-19, 1720,

2001, 2100, 2105, 2667, 2671, 2699, 2115-16, 2129, 2134, 2144-45, 2648, 2650, 2652, 1996, 2011-12, 2014, 2458, 2463). The record also included evidence that Ms. Thompson suffered from chronic fatigue (R. 845, 2100, 2105, 2115-16, 2129, 2134, 2144-45, 2648, 2650, 2652) and excessive somnolence disorder (R. 1996, 2011-12, 2014, 2458, 2463).

The ALJ specifically examined Ms. Thompson's treatment records, which noted that she experienced fatigue (R. 1116 (citing Exhibits 7F/1, 13F/1, 18F/2, 20F/1-3, 21F/21-22, 22F, 26F/32-33, 29F/7, 16, & 23, 30F, 31F, 32F/2, 35F/33 & 35-7, & 36F). However, the ALJ said, "the claimant's complaints of fatigue were not consistent and physical examinations were unremarkable, showing normal range of motion, and 5/5 strength in all extremities, and no indication that the claimant was in any acute distress or that the claimant needed to take frequent naps" (R. 1116).

The ALJ thus discounted Ms. Thompson's fatigue in part because of her so-called inconsistent complaints (R. 1116). But Ms. Thompson suffers from fatigue because of multiple sclerosis, which by its nature is a fluctuating condition. *See Managing MS: Should You Worry About New, Changing Symptoms?*, Cleveland Clinic, https://health.clevelandclinic.org/managing-ms-worry-new-changing-symptoms/ (last visited June 23, 2021) ("It's common for symptoms to come and go, related to impaired electrical conduction through chronic multiple sclerosis scars or old damage"); *MS Symptoms*, National Multiple Sclerosis Society, https://www.nationalmssociety.org/Symptoms-Diagnosis/MS-Symptoms (last visited June 23, 2021) ("MS symptoms are variable and unpredictable. No two people have exactly the same symptoms, and each person's symptoms can change or fluctuate over time."). The ALJ recognized that Ms. Thompson's fatigue stemmed from multiple sclerosis. (R. 1114) ("claimant testified that she is unable to work because she suffers from fatigue . . . due to multiple sclerosis;" "claimant stated that she experiences approximately two flare-ups every month"). The ALJ seemed to reason that, because Ms. Thompson's complaints about fatigue were inconsistent, perhaps then it was less of a problem; but the ALJ didn't address that the inconsistent fatigue may

have been perfectly consistent with Ms. Thompson's underlying condition—multiple sclerosis. In fact, one of Ms. Thompson's treating physicians, Dr. Bayer, pointed out, "The patient has some fluctuation in her exam from prior visits. This is consistent with the nature of her disease [multiple sclerosis]" (R. 768). That said, the ALJ should have considered Ms. Thompson's inconsistent fatigue in the context of her fluctuating condition, rather than using the inconsistency as a reason to give less weight to it. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("snapshot of any single moment" says little about a fluctuating condition); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.").

The ALJ further discounted Ms. Thompson's fatigue because her physical examinations were unremarkable and there was no indication that Ms. Thompson was in any acute distress (R. 1116). The ALJ didn't explain how the results of these physical examinations, showing normal range of motion and 5/5 strength in all extremities, explained away Ms. Thompson's fatigue (R. 1116). The ALJ also said "the claimant was alert and oriented to person, place, and time; her remote and recent memory appeared intact; her attention span, concentration, and fund of knowledge appeared to be normal; and her judgment and insight appeared normal" (R. 1116). But once again, the ALJ didn't connect any of these findings to the severity of Ms. Thompson's fatigue (R. 1116). *See Bothwell v. Berryhill*, 2019 U.S. Dist. LEXIS 16966, 11 (N.D. Ind. Feb. 1, 2019) ("The ALJ did not explain why findings that Plaintiff was alert, fully oriented and had normal thought processes during medical examinations are inconsistent with fatigue and a need to take naps."); *see also O'Connor-Spinner*, 627 F.3d at 618 (the ALJ must provide a "logical bridge" between the evidence and her conclusions). Furthermore, while at times Ms. Thompson may have been alert and fully oriented, this doesn't necessarily indicate that she was always this way given the fluctuating nature of multiple sclerosis. *See Punzio*, 630 F.3d at 710.

6

The ALJ last discounted Ms. Thompson's fatigue because there was "no indication . . . that the claimant needed to take frequent naps" (R. 1116). Dr. Vyas opined that Ms. Thompson would need unscheduled breaks every 30 minutes to an hour for about 15 minutes (R. 809); Ms. Thompson's physical therapy notes documented that she needed frequent rest breaks (R. 2529-32); and Ms. Thompson's doctors noted that she suffered from fatigue in conjunction with her multiple sclerosis and prescribed her medication to combat the fatigue (R. 626, 759, 814-15, 838-39, 845-46, 850, 854, 858, 863, 865, 869, 872, 875, 880, 884, 888, 892, 894, 898, 800, 904, 906, 910, 1001, 1382, 1398, 1700, 1705, 1707, 1717-19, 1720, 2001, 2100, 2105, 2667, 2671, 2699, 2115-16, 2129, 2134, 2144-45, 2648, 2650, 2652, 1996, 2011-12, 2014, 2458, 2463). It was error for the ALJ to rely selectively on some physicians who shared no comments on naps while disregarding this other evidence that did. *See Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018) (ALJs are not to cherry-pick evidence from the record to support their conclusions without confronting the evidence that weighs against their findings).

In its response, the Commissioner restates the points made by the ALJ (*i.e.*, that Ms. Thompson's complaints about fatigue were inconsistent and that her physical examinations were unremarkable and there was no indication that Ms. Thompson was in any acute distress or needed to take frequent naps). The Commissioner offers no basis to show how the ALJ connected these points to her conclusion about the severity of Ms. Thompson's fatigue, or why these explanations make sense in light of her multiple sclerosis, particularly as a fluctuating condition.

After discounting the severity of Ms. Thompson's fatigue, the ALJ said she was addressing fatigue by including certain limitations in the RFC: "In an effort to address and decrease the claimant's stress and fatigue . . . the claimant is only able to perform simple, routine tasks; perform simple work-related decisions; occasionally interact with supervisors and coworkers; and never interact with the public" (R. 1117). Although the ALJ limited Ms. Thompson to simple work and few social

interactions, she didn't explain why these limitations would accommodate Ms. Thompson's fatigue. *See Allensworth v. Colvin*, 814 F.3d 831, 835 (7th Cir. 2016) (ALJ erred by not explaining why someone with hypersomnia should be able to stay awake at work just because it is simple work). Put another way, the ALJ didn't logically connect the evidence of fatigue and her ultimate findings. *See O'Connor-Spinner*, 627 F.3d at 618; *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017) ("ALJ made no effort to 'build an accurate and logical bridge'"). Whether someone occasionally interacts with colleagues or patrons does little to address a need for times of repose from work for the fatigue she experiences, at least not on this record.

Furthermore, the ALJ erred by not analyzing the symptoms of her fatigue under Social Security Ruling 16-3p. *See* SSR 16-3p, 2016 SSR LEXIS 4, 3-4 (Mar. 16, 2016) ("once an underlying physical or mental impairment (s) that could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult"). The ALJ noted Ms. Thompson's fatigue from her underlying condition of multiple sclerosis (R. 1116) but seems not to have drawn the intensity or persistence into her rationale for a decision. Indeed, she discounted it as inconsistent, not as naturally fluctuating. The ALJ didn't reconcile her position with the ample evidence in the record showing that Ms. Thompson suffered from chronic fatigue (R. 845, 2100, 2105, 2115-16, 2129, 2134, 2144-45, 2648, 2650, 2652) and excessive somnolence disorder (R. 1996, 2011-12, 2014, 2458, 2463). On remand, the ALJ must carefully evaluate the intensity and persistence of Ms. Thompson's fatigue and then explain the connection between the symptoms of fatigue and the ALJ's conclusions.

The Commissioner argues that the ALJ considered the findings of the agency's medical consultants, Drs. Brill and Eskonen, who specifically acknowledged Ms. Thompson's fatigue yet still found that she could perform a reduced range of light work (R. 1118, 87-88, and 107-10). Though

that may be so, the focus here is on "the reasons articulated *by the ALJ*." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (italics in original). The ALJ gave the opinions of Drs. Brill and Eskonen only "some weight" and found that the evidence from the hearing supported greater restrictions (R. 1118). Specifically, the ALJ referenced Ms. Thompson's reports of fatigue and weakness on her left side and decided that sedentary work was more appropriate (R. 1118). It was not improper for the ALJ to discount the weight of these opinions based on other record evidence. *See* 20 C.F.R. § 404.1527(c)(4) (ALJ is to consider consistency with the record as a whole in evaluating a medical opinion). But the ALJ didn't explain why Ms. Thompson's fatigue and weakness on her left side warranted a limitation to sedentary work without any time built in for Ms. Thompson to take breaks for rest.

B.    *Medical Opinion Evidence.*

Ms. Thompson argues that the ALJ didn't properly weigh the opinion evidence, specifically that of Dr. Daksha Vyas. A treating physician's opinion on the nature and severity of a medical condition is given controlling weight if it is well supported by medical findings and consistent with the other evidence. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[1] The ALJ is required to evaluate medical opinions using the following factors: the examining relationship; the treatment relationship (including length of treatment and frequency of examination and the nature and extent of the treatment relationship); the opinion's support; the opinion's consistency with the record; the physician's specialization; and other factors. 20 C.F.R. § 404.1527(c). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

Dr. Vyas is a neurologist and began treating Ms. Thompson for her multiple sclerosis in August 2015 (R. 1118). In November 2015, Dr. Vyas completed a residual functional capacity

---

[1] Although the Agency changed the rules regarding the evaluation of medical evidence in 2017, 20 C.F.R. §§ 404.1527 and 416.927 still apply in this case because Ms. Thompson filed her claim before March 27, 2017. *See Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (explaining that these rules continue to govern claims filed before March 27, 2017).

questionnaire in evaluating Ms. Thompson's multiple sclerosis (R. 806-11). Among other things, Dr. Vyas concluded that Ms. Thompson would experience pain or symptoms severe enough to interfere with the attention and concentration needed for simple work tasks, that Ms. Thompson would need to take 15 minute unscheduled breaks every 30 minutes to an hour during an eight-hour work day, and that Ms. Thompson would likely be absent from work more than four days per month as a result of her impairment and treatments (R. 1118). The ALJ only gave Dr. Vyas' opinions "some weight" rather than controlling weight (R. 1118).

First, the ALJ discounted the opinions of Dr. Vyas because, just three months before Dr. Vyas issued his statement, Ms. Thompson reported that her symptoms were "controlled." However, this reliance on a snapshot once again overlooks the fluctuating nature of multiple sclerosis. *See Punzio*, 630 F.3d at 710. The Commissioner argues that the ALJ understood that Ms. Thompson's condition fluctuated because she referred to flare-ups in her decision. Indeed, the ALJ noted that Ms. Thompson experienced occasional flare-ups and that most of them were minor and treated with prescription medication (R. 1116). The ALJ also noted that most of Ms. Thompson's flare-ups occurred when she was out of her multiple sclerosis medications (R. 1117). But the ALJ didn't address whether Ms. Thompson only experienced fatigue during her flare-ups. Instead, in discussing Ms. Thompson's flare-ups, the ALJ merely referenced Ms. Thompson's pain and upper extremity function (R. 1116). This is consistent with Ms. Thompson's treatment notes from physical therapy in November 2017, which mentioned a recent flare that caused right shoulder pain and a decreased ability to raise her right arm (R. 1429, 1436, 1442). Other evidence in the record suggests that Ms. Thompson continued experiencing fatigue while on medication for multiple sclerosis and that certain medications exacerbated her fatigue. The ALJ should have analyzed these medications and their side effects under SSR 16-3p. *See* SSR 16-3p, 2016 SSR LEXIS 4, 18-19 (Mar. 16, 2016) (factors to consider in evaluating intensity, persistence, and limiting effects of an individual's symptoms include the "type, dosage,

effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms"). For example, Ms. Thompson points to a record from August 2015, which shows that she was taking Tecfidera for her multiple sclerosis yet still having problems with fatigue (R. 906). A later record from September 2017 explains that the Tecfidera wasn't working, so Ms. Thompson started taking Copaxone in June 2017, which caused her to have more fatigue (R. 2001). For these reasons, the fact that Ms. Thompson's flare-ups may have been occasional, minor, and treated with medication isn't a good reason to discount Dr. Vyas' opinions about Ms. Thompson's fatigue if the fatigue didn't run hand-in-hand with the flare-ups and if the medication for the flare-ups made the fatigue worse.

Second, the ALJ discounted the opinions of Dr. Vyas because he had only been treating Ms. Thompson for three months and didn't provide any treatment after 2016. But again, the ALJ doesn't explain why Dr. Vyas would not have been aware of Ms. Thompson's medical history, or why this limited time frame of treatment is reason to give less weight to Dr. Vyas' opinion. Perhaps there was cause to do so but that remains unexplained. The Commissioner makes no argument on this point to give reason to affirm.

Third, the ALJ discounted Dr. Vyas' opinions based on other record evidence. In so doing, the ALJ committed a similar error to the assessment of fatigue. For example, she mentioned that Ms. Thompson "continued to complain about fatigue . . . but her exams were largely normal, including her strength and gait . . . and she did not appear in any distress" (R. 1118-19), without explaining how Ms. Thompson's fatigue was linked to her strength and gait and whether she was in distress. *See O'Connor-Spinner*, 627 F.3d at 618; *Bothwell*, 2019 U.S. Dist. LEXIS 16966 at 11. This reason for giving less weight to Dr. Vyas' opinions is inadequate to build a logical bridge between the evidence and the result. *See Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018) ("the ALJ's reasons for giving little

weight to Dr. Paul's most recent opinions are inadequate to 'build an accurate and logical bridge between the evidence and the result'").

Fourth, the ALJ did not discuss the consistency between Dr. Vyas' assessment and that of other physicians, including the agency's own experts. Dr. Vyas concluded that Ms. Thompson would only be able to use her right and left hands to grasp, turn, and twist objects ten percent of the time, and that Ms. Thompson would only be able to use her fingers for fine manipulations twenty percent of the time (R. 810). One of the agency's experts, Dr. R. Jao, found that, based on dynamometer testing, Ms. Thompson could only generate 39.1 kilograms (or 86.2 pounds) of force with her right hand and 12.3 kilograms (or 27.1 pounds) of force with her left hand (R. 628). Using the same testing, another agency expert, Dr. J. Smejkal, found that Ms. Thompson could only generate 17.2 kilograms of force with her right hand (or 37.9 pounds) and 12.0 kilograms (or 26.5 pounds) of force with her left hand (R. 761). If a claimant has trouble with "handling," a finding that is consistent with reduced grip strength, that should be addressed because handling is "required in almost all jobs" and "[s]ignificant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do." *See Hermann v. Colvin*, 772 F.3d 1110, 1112 (7th Cir. 2014). *In Hermann*, the circuit cited a study on the normal ranges of grip strength by age, sex, and hand dominance. *Id.* (citing Virgil Mathiowetz *et al.*, *Grip and Pinch Strength: Normative Data for Adults*, 66 Archives of Physical Medicine and Rehabilitation 69, 71 (1985) https://www.researchgate.net/publication/19190602_Grip_and_Pinch_Strength_Normative_data_for_adults). According to that study, for women aged 25-29, like Ms. Thompson at the time of the agency's expert evaluations, the mean right-hand grip strength is 74.5 pounds and the mean left-hand grip strength is 63.5 pounds. This would place Ms. Thompson's left-hand grip strength, in particular, well below the normal range for women of her age. For this reason, the ALJ erred by not at least explaining why she didn't include a limitation on reduced grip strength as part of Ms. Thompson's RFC. *See* SSR 96-8p, 1996 SSR LEXIS

5, 19 (July 2, 1996) ("The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

Fifth, the ALJ did not address why she discarded Dr. Vyas' opinion that Ms. Thompson required an at-will-sit-and-stand option when another treating physician, Dr. Anand Shah, corroborated Ms. Thompson's back pain. In August 2015, Dr. Shah wrote that Ms. Thompson had midline low back pain without sciatica, which was likely due to her weight (R. 798). *See Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014) (claimant's obesity "might make it difficult for her to sit for long periods of time, as sedentary work normally requires"). The ALJ said "[t]here is no evidence contained in the record that demonstrates that the claimant's obesity was making her back pain or multiple sclerosis worse" (R. 1112); however, the ALJ erred in making this statement given Dr. Shah's treatment notes about Ms. Thompson's back pain likely due to weight.

C.    *Assessment of Ms. Thompson's Symptoms.*

Ms. Thompson argues that the ALJ didn't properly assess her symptoms. The ALJ identified Ms. Thompson's symptoms as fatigue and pain in her legs and arms (R. 1114). Ms. Thompson criticizes the ALJ for not confronting objective findings, such as reduced grip strength and motor deficits. This echoes Ms. Thompson's point about the ALJ not discussing the consistency between the opinions of Dr. Vyas and the agency's experts about reduced grip strength and motor deficits. As discussed above, the ALJ erred by not at least explaining why she didn't include a limitation on reduced grip strength as part of Ms. Thompson's RFC. *See* SSR 96-8p, 1996 SSR LEXIS 5, 19 (July 2, 1996) ("The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.").

Ms. Thompson criticizes the ALJ for not considering her use of a strong narcotic medication or that medication's side effects, but the ALJ noted that Ms. Thompson took various medications for her condition (R. 1116, 1118) and specifically that Ms. Thompson was prescribed Provigil and

reported some intolerance to medication (Rebif) (R. 1118). Therefore, the ALJ gave Ms. Thompson's medications consideration.

Ms. Thompson also argues that the ALJ considered how she engaged in some activities, such as homeschooling her daughter (R. 1115, 1117), but never explained how her ability to engage in these activities was inconsistent with her symptoms, particularly because she only did these activities when she felt able and was assisted by her mother. The ALJ said Ms. Thompson's "ability to perform activities of daily living also suggest greater ability" (R. 1117). As previously discussed, the ALJ erred by not considering the inconsistency of Ms. Thompson's fatigue in light of her multiple sclerosis, which is a fluctuating condition. Proper analysis of this issue may alter the rest of the decision. In reassessing Ms. Thompson's fatigue on remand, the ALJ should be cautious not to equate Ms. Thompson's ability to perform activities of daily living with her ability to work. *Hughes v. Astrue*, 705 F.3d 276, 278 (noting that, with activities of daily living, a person has more flexibility, can get help from other persons, and is not held to a minimum standard of performance).

Ms. Thompson also criticizes the ALJ for describing her treatment as "routine and conservative" without explaining why she should have pursued other treatment options. The Commissioner didn't address this argument. The ALJ made this point when discussing the inconsistency regarding the intensity, persistence, and limiting effects of Ms. Thompson's symptoms, including fatigue (R. 1115). The ALJ already must revaluate Ms. Thompson's fatigue on remand. In so doing, the ALJ should be cautious not to slip into the role of playing doctor by discounting the severity of Ms. Thompson's symptoms based on the level of her treatment, *see Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (ALJ impermissibly played doctor when he determined that the claimant's level of treatment failed to infer limitations beyond those described in the decision); *see also Hughes*, 705 F.3d at 278 (ALJ "was troubled by 'lack of aggressive treatment' for her health problems, without

pausing to consider what 'aggressive treatment' might have solved them"), but the court otherwise leaves this issue to the ALJ to weigh the evidence in light of the other remand issues.

D.     *Evidence from Ms. Thompson's Mother.*

Ms. Thompson argues that the ALJ erred in dismissing the evidence from her mother on the basis of bias (R. 1119). There was no error here. The ALJ didn't outright dismiss this evidence; she merely gave it "minimal weight" (R. 1119). The ALJ gave this evidence less weight for additional reasons—namely, that Ms. Thompson's mother is not medically trained, and the mother's opinion didn't outweigh the other objective evidence (R. 1119). This court will not reweigh the evidence in its review. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000) (the court cannot reweigh the evidence or substitute its own judgment for that of the ALJ).

That said, the ALJ didn't build a logical bridge from other evidence to her conclusion because of the errors in addressing Ms. Thompson's fatigue and the opinions of Dr. Vyas, and this prevents meaningful review. *See Young*, 362 F.3d at 1002. Accordingly, the court remands the case for further proceedings before the ALJ. The ALJ's finding may well be the same, but the evidence must be considered in reaching a conclusion here.

CONCLUSION

The court GRANTS Ms. Thompson's motion for remand (ECF 14) and REMANDS her case for further proceedings before the ALJ. This order terminates the case.

SO ORDERED.

June 29, 2021                              *s/ Damon R. Leichty*
                                           Judge, United States District Court